IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Appeal of City Turf Club Op Co. | : | **CONSOLIDATED CASES** |
| | : | |
| From a Decision of: Zoning Board of Adjustment | : | |
| | : | |
| Appeal of: Packer Park Civic Association | : | No. 731 C.D. 2022 |
| | : | |
| In re: Appeal of Packer Park Civic Association | : | |
| | : | |
| From a Decision of: Zoning Board of Adjustment | : | |
| | : | |
| Appeal of: Packer Park Civic Association | : | No. 733 C.D. 2022 |
| | : | Argued: November 9, 2023 |

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE ELLEN CEISLER, Judge
HONORABLE LORI A. DUMAS, Judge


OPINION
BY JUDGE FIZZANO CANNON                    FILED: January 8, 2024


These consolidated appeals[1] involve two separate orders of the Court of Common Pleas of Philadelphia County (Trial Court). Each order deals with a different aspect of the application of City Turf Club Op Co. (Applicant) to relocate an existing race and sportsbook operation from its current location at 700 Packer

---

[1] This Court consolidated these matters *sua sponte* by order dated November 4, 2022.

Avenue, Philadelphia, to a new location inside a Chickie's & Pete's restaurant located at 1526 Packer Avenue, Philadelphia (Relocation Application).

In the first of these two matters, the Philadelphia Department of Licenses and Inspections (L&I) retracted a notice of referral and issued a notice of refusal under the Philadelphia Zoning Code (Zoning Code)[2] regarding the Relocation Application. Applicant appealed L&I's notices to the Philadelphia Zoning Board of Adjustment (Board), which sustained the appeal. The Trial Court affirmed the Board's determination.

In the second matter, the Board denied Applicant's Application for Special Exception. The Trial Court reversed the Board's decision after determining that the Board erred and abused its discretion in concluding that Applicant had not met the standard for the issuance of a special exception.

Upon review, we affirm the Trial Court's orders.

## I. Background and Procedural Posture

On July 31, 2020, Applicant submitted the Relocation Application to L&I seeking to relocate its existing race and sportsbook operation from 700 Packer Avenue (Current Location) to the Chickie's & Pete's restaurant located at 1526 Packer Avenue (New Location). *See* Trial Court Memorandum Opinion dated July 1, 2022 (Trial Court Opinion)[3] at 2. The New Location is in a CA-1 zoning district, where casinos are not a permitted use. *See id.*

---

[2] PHILA., PA., ZONING CODE (2012), available at https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-203439 (last visited Jan. 5, 2024).

[3] The Trial Court adopted the Trial Court Opinion as its Pennsylvania Rule of Appellate Procedure 1925(a) opinion for both Commonwealth Court Docket Nos. 731 C.D. 2022 and 733 C.D. 2022 prior to this Court's consolidation of the matters.

On August 13, 2020, L&I issued a Notice of Referral determining that the sportsbook operation that was the subject of the Relocation Application constituted an "assembly and entertainment" use requiring a special exception.[4] *See* L&I Notice of Referral dated August 13, 2020 (Notice of Referral), Reproduced Record (R.R.) at 537a; *see also* Trial Court Opinion at 2. Based on the Notice of Referral, on September 11, 2020, Applicant filed a special exception application with the Board (Special Exception Application). *See* Special Exception Application; R.R. at 539a-40a.

The Board conducted an initial hearing on the Special Exception Application on December 1, 2020. *See* Notes of Testimony, December 1, 2020 (N.T. 12/1/2020); R.R. at 20a-112a. At the December 1, 2020 hearing, the Packer Park Civic Association (Association), through counsel, contested both the Special Exception Application and L&I's Notice of Referral. The Association argued that L&I should have categorized the sportsbook operation as a "casino" use requiring a use variance as opposed to an "assembly and entertainment" use requiring only a special exception. At the conclusion of the December 1, 2020 hearing, the Board scheduled the resumption of the hearing on the Special Exception Application for February 10, 2021.

On January 28, 2021, prior to the scheduled resumption of the hearing, L&I revoked the Notice of Referral and issued in its stead a Notice of Refusal that explained that "the [Notice of R]eferral [for the Relocation] Application [that] was

---

[4] A "referral" is a procedure under the Zoning Code whereby L&I may refer a use permit application to the Board for a special exception approval determination if an application to the Board for a special exception is filed within 30 days of the L&I referral. *See* Zoning Code § 14-303(7).

issued on [August 13, 2020,[5]] was incorrect. The corrected [Notice of R]efusal was issued on 1/28/2021." L&I Notice of Refusal dated January 28, 2021 (Notice of Refusal), R.R. at 674a; *see also* Trial Court Opinion at 2-3. Applicant appealed the revocation of the Notice of Referral and issuance of the Notice of Refusal on February 4, 2021. *See* Application for Appeal dated February 4, 2021; R.R. at 671a-72a.

The Board conducted further hearings on the matter on February 10, 2021, March 9, 2021, May 25, 2021, and June 9, 2021. *See* Notes of Testimony, February 10, 2021 (N.T. 2/10/2021), R.R. at 113a-86a; Notes of Testimony, March 9, 2021 (N.T. 3/9/2021), R.R. at 187a-402a; Notes of Testimony, May 25, 2021 (N.T. 5/25/2021), R.R. at 403a-529a; Notes of Testimony, June 9, 2021 (N.T. 6/9/2021), R.R. at 530a-34a. Thereafter, the Board issued two decisions filed on February 27, 2022, and March 3, 2022. *See* Findings of Fact and Conclusions of Law of the Philadelphia Zoning Board of Adjustment filed February 27, 2022 (February 2022 Board Decision); Findings of Fact and Conclusions of Law of the Philadelphia Zoning Board of Adjustment filed March 3, 2022 (March 2022 Board Decision) (collectively, Board Decisions). In one of the Board Decisions, the Board reversed L&I on the Notice of Referral/Notice of Refusal issue, determining, as had L&I initially, that L&I should have referred the Relocation Application to the Board as an "assembly and entertainment" use to determine whether Applicant could meet the required burden for the issuance of a special exception. *See* March 2022 Board Decision; *see also* Trial Court Opinion at 3. In the other Board Decision, the Board determined that Applicant did not meet its burden for the issuance of a special

---

[5] The Notice of Refusal erroneously indicated that L&I had issued the Notice of Referral on September 4, 2020. *See* Notice of Refusal, R.R. at 647a.

4

exception. *See* February 2020 Decision; *see also* Trial Court Opinion at 3. Appeals to the Trial Court of both the Board's determinations were filed; the Association challenged the decision relating to the Notice of Refusal, and Applicant challenged the decision relating to the special exception determination.

On July 1, 2022, the Trial Court affirmed the Board's conclusion in the March 2020 Decision that the relocated sportsbook operation at the New Location is an "assembly and entertainment" use as opposed to a "casino" use. However, the Trial Court reversed the Board's conclusion in the February 2020 Decision that Applicant had not met the requirements for the issuance of a special exception. *See* Trial Court Opinion at 1-2 & 12. The Trial Court remanded the matter to the Board with instructions to issue Applicant a special exception allowing for the relocation of Applicant's sportsbook operation from the Current Location to the New Location. *See* Trial Court Order dated July 1, 2022 (Trial Court Order) at 1-2 (pagination supplied); *see also* Trial Court Opinion at 12. The Association appealed to this Court.

## II. Issues

The instant appeal presents two questions, succinctly summarized by Applicant as follows: "(a) is the operation of a [s]portsbook located within . . . an existing restaurant/bar properly considered an assembly and entertainment use; and (b) if so, did [Applicant] provide sufficient evidence to the [] Board [] to entitle it to the issuance of a [s]pecial [e]xception[?]" Applicant's Br. at 2.

The Association presents multiple alternative theories of Trial Court error. First, the Association argues that the Board erred by overruling L&I's determination that the proposed sportsbook is a licensed gaming facility under the

5

Pennsylvania Race Horse Development and Gaming Act (Gaming Act).[6] *See* Association's Br. at 22-30. Second, the Association alternatively argues that the record contains substantial evidence to support the Board's denial of a special exception due to Applicant's failure to meet its initial burden of production under the Zoning Code. *See* Association's Br. at 30-36. Third, the Association argues that, if Applicant met its initial burden regarding the special exception application, the Association produced adequate credible evidence that the existence of a sportsbook at the New Location would have a detrimental impact on the health, safety, and welfare of the community, which credible evidence Applicant failed to rebut. *See* Association's Br. at 37-45. Finally, the Association argues, also in the alternative, that it demonstrated that the relocation of Applicant's sportsbook operation to the New Location would fail to conform to the purpose, spirit, and intent of the Zoning Code. *See* Association's Br. at 46-47.

Applicant counters by arguing that the Trial Court correctly determined that L&I properly issued the initial Notice of Referral for a special exception rather than a Notice of Refusal. *See* Applicant's Br. at 14-23. Further, Applicant argues that the Trial Court properly found that Applicant fulfilled all the requirements for a special exception and that the Association failed to meet its burden to demonstrate that the relocation of its sportsbook operation to the New Location would adversely affect the community. *See id.* at 23-37.

### III. Discussion

Where a court of common pleas takes no additional evidence in reviewing a land use appeal determination by a zoning hearing board, this Court's standard of review is limited to determining whether the local governing body that

---

[6] 4 Pa.C.S. §§ 1101-1904.

issued the challenged decision abused its discretion or committed an error of law. *Miravich v. Twp. of Exeter, Berks Cnty.*, 54 A.3d 106, 110 n.4 (Pa. Cmwlth. 2012); *see also Metal Green Inc. v. City of Philadelphia*, 266 A.3d 495, 513 (Pa. 2021). Local governing bodies abuse their discretion by making factual findings that are not supported by substantial evidence. *Miravich*, 54 A.3d at 110 n.4. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Rural Route Neighbors*, 960 A.2d 856, 860 n.4 (Pa. Cmwlth. 2008).

## A. Notice of Referral v. Notice of Refusal

As the Board noted, because nothing changed between L&I's issuance of the Notice of Referral and its subsequent retraction and replacement of the Notice of Referral with the Notice of Refusal, the legal question before the Board in Applicant's appeal was whether Applicant's proposed sportsbook use for the New Location was an "assembly and entertainment" use or a "casino" use under the Zoning Code. *See* March 2022 Board Decision at 6. This issue presents a question of statutory interpretation. When interpreting the meaning of a zoning ordinance, we are guided by the principles of statutory construction with the primary objective of determining the intent of the legislative body that enacted the ordinance. *See THW Grp., LLC v. Zoning Bd. of Adjustment*, 86 A.3d 330, 336 (Pa. Cmwlth. 2014). We note that Section 603.1 of the Pennsylvania Municipalities Planning Code (MPC),[7] which provides general principles relating to the interpretation of local zoning ordinances, states as follows:

---

[7] Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10603.1.

> In interpreting the language of zoning ordinances to determine the extent of the restriction upon the use of the property, the language shall be interpreted, where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction.

53 P.S. § 10603.1. Generally, a "zoning officer shall administer the zoning ordinance in accordance with its literal terms[.]" Section 614 of the MPC, 53 P.S. § 10614. Additionally, "[w]here [a] statute or ordinance defines a word or phrase therein the court is bound thereby." *Hughes v. Sch. Dist. of Pittsburgh*, 108 A.2d 698, 699 (Pa. 1954) (emphasis omitted). As our Supreme Court has explained:

> A legislative body may, in a statute or ordinance, furnish its own definitions of words and phrases used therein in order to guide and direct judicial determination of the intendments of the legislation although such definitions may be different from ordinary usage; it may create its own dictionary to be applied to the particular law or ordinance in question.

*Hughes*, 108 A.2d at 699 (quoting *Sterling v. City of Phila.*, 106 A.2d 793, 795 (Pa. 1954)). Further, "[w]ith respect to zoning matters, undefined terms are given their plain meaning, and any doubt is resolved in favor of the landowner and the least restrictive use of the land." *Kohl v. New Sewickley Twp. Zoning Hearing Bd.*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015) (some brackets and internal quotation marks omitted).

With this background in mind, we now turn to the Zoning Code and the relevant definitions contained therein. The Zoning Code defines "assembly and entertainment" uses, in relevant part, as "[u]ses that provide gathering places for

participant or spectator recreation, entertainment, or other assembly activities. Assembly and entertainment uses may provide incidental food or beverage service for on- or off-premise[s] consumption." Zoning Code § 14-601(7)(c). The Zoning Code further defines a "casino" as a specific type of assembly and entertainment use as follows: "A licensed gaming facility as authorized by the Commonwealth of Pennsylvania pursuant to 4 Pa.C.S. Part I, the '[Gaming Act].'" Zoning Code § 14-601(7)(c)(.1). The Zoning Code continues to explain that "[a] 'casino' may also be referred to as a 'licensed gaming facility'." *Id.*

The Gaming Act, on which the Zoning Code's definition of "casino" relies, does not include a definition of the term "licensed gaming facility." The Gaming Act does, however, define the term "licensed facility" as follows:

> (1) The physical land-based location at which a licensed gaming entity[8] is authorized to place and operate slot machines and, if authorized by the Pennsylvania Gaming Control Board under Chapter 13A (relating to table games), to conduct table games and if authorized under Chapter 13B (relating to interactive gaming), to conduct interactive gaming. The term includes any:
>
>> (i) area of a licensed racetrack at which a slot machine licensee was previously authorized pursuant to section 1207(17) (relating to regulatory authority of board) to operate slot machines prior to the effective date of this paragraph;
>>
>> (ii) board-approved interim facility or temporary facility;

---

[8] The Gaming Act defines a "licensed gaming entity" as "[a]ny slot machine licensee, manufacturer licensee, supplier licensee or other person licensed by the Pennsylvania Gaming Control Board [(PGCB)] under this part." 4 Pa.C.S. §§ 1103.

9

(iii) area of a hotel which the Pennsylvania Gaming Control Board determines is suitable to conduct table games; and

(iv) area of a licensed facility where casino simulcasting is conducted, as approved by the Pennsylvania Gaming Control Board.

(2) The term shall not include a redundancy facility or an interactive gaming restricted area which is not located on the premises of a licensed facility as approved by the Pennsylvania Gaming Control Board and which is maintained and operated by an interactive gaming certificate holder in connection with interactive gaming or casino simulcasting.

4 Pa.C.S. § 1103.

Of further relevance, the Gaming Act restricts sports betting to licensed facilities, temporary facilities, nonprimary locations, and the internet. *See* 4 Pa.C.S. § 13C21(a). The Gaming Act defines a "nonprimary location" as "[a]ny facility in which pari-mutuel wagering is conducted by a licensed racing entity other than the racetrack where live racing is conducted." 4 Pa.C.S. § 1103. The Gaming Act defines a "licensed racing entity" as "[a]ny legal entity that has obtained a license to conduct live thoroughbred or harness horse race meetings respectively with pari-mutuel wagering from the State Horse Racing Commission pursuant to the Race Horse Industry Reform Act [(Racing Act)].[9]" 4 Pa.C.S. § 1103.[10]

_____

[9] 3 Pa.C.S. §§ 9301-9374.

[10] No dispute exists that Applicant, which has owned a live racing track in Bensalem, Pennsylvania, since 2006, is a "licensed racing entity."

10

Based on these definitions, the Board concluded that relocating Applicant's sportsbook operation to the New Location would not constitute a "casino" use, but instead was properly categorized as an "assembly and entertainment" use. *See* March 2022 Board Decision at 7. The Board decided that msthe New Location, by virtue of not having slot machines or table games, would not have the characteristics of a casino; that the Gaming Act distinguishes between licensed facilities and nonprimary locations; and that a nonprimary location is not transformed into a casino simply because sports betting is permitted at the location. *See* March 2022 Board Decision at 7;[11] *see also* Trial Court Opinion at 5. In making

[11] Specifically, the Board explained as follows:

> In reaching this conclusion, the Board finds arguments raised in Applicant's legal memorandum particularly persuasive. Notable among these are:
>
>> a. The Zoning Code defines a casino use by direct reference to and in complete reliance on the [] Gaming Act . . . [and] [t]here can be (and is) no dispute that [] Applicant's proposed use is not a casino – or "licensed facility" as is the defined term under the Gaming Act.
>>
>> b. The Proposed use will not have the distinctive characteristics of a casino – slot machines and table games.
>>
>> c. The [] Gaming Act distinguishes between licensed facilities and "non[]primary locations."
>>
>> d. It is inconsequential that the Racing Act's definition of "nonprimary location" does not specifically reference sports wagering given that the Gaming Act authorizes the activity and permits it at nonprimary locations.
>>
>> e. Section 13C21 of the Gaming Act discusses the locations at which sports betting is authorized and identifies them separately as (i) a licensed facility, (ii) a temporary facility,

11

this determination, the Board further considered the clarification provided by the Chief Counsel to the Pennsylvania Gaming Control Board that the New Location will not constitute a "licensed facility" but instead will be a "nonprimary location" under the Gaming Act.[12]  In consideration of this statement, the Board rejected the argument that an applicant must be authorized to operate slot machines – and therefore be a casino – in order to offer sports wagering at a nonprimary location. *See* March 2022 Board Decision at 8.

We find that the Board did not err by determining that the proposed New Location is not a "casino" use under the Zoning Code.  The New Location is a

---

(iii) online and (iv) a nonprimary location.  The only conclusion that could be drawn from this is that a non[]primary location is not the same as a licensed facility . . . and it does not become a licensed facility by the [PGCB] authorizing sports betting to take place there.

f. The Gaming Act provision allowing sports betting at non[]primary locations expressly prohibits casino gaming at such locations.

March 2022 Board Decision at 7.

[12] Chief Counsel to the Pennsylvania Gaming Control Board, R. Douglas Sherman, Esquire, explained in a letter to Applicant's counsel:

You are correct in your assertion that the [Current Location] is not a "licensed facility" as it is not licensed by the [PGCB], it is not a Category 1, 2, 3 or 4 licensed facility and is not authorized to operate slots machines or table games . . . . [D]ecisions of the locus of nonprimary locations under the [Racing] Act are committed to the State Horse Racing Commission.  If that Commission approves a location for a nonprimary location under its governing act, the location is considered a "nonprimary location" and is not a "licensed facility" under the Gaming Act.

March 2022 Board Decision at 7.

12

proposed relocation of Applicant's existing use at the Current Location: pari-mutuel wagering on horse racing and sports wagering at a nonprimary location. A "nonprimary location" is separate and distinct from a "licensed facility" under the Gaming Act, although sports betting is authorized at each. *See* 4 Pa.C.S. § 13C21. "Licensed facilities" are those facilities authorized to operate table games and slot machines, *i.e.*, a traditional casino experience. *See* 4 Pa.C.S. § 1103. The proposed New Location will have neither table games nor slot machines. Instead, the New Location will only have pari-mutuel horse race betting and sports wagering, both of which are allowed at nonprimary locations. As such, the use proposed by Applicant for the New Location is that of a nonprimary location as opposed to a casino.

Further, as the Trial Court observed, the argument that the Zoning Code's definition of "casino" was intended to be broad and cover facilities such as the sportsbook proposed for the New Location is "speculative" and "betrayed by the [text of the] actual statutes." Trial Court Opinion at 5. As discussed *supra*, the Zoning Code's definition of casino relies on the text of the Gaming Act, which, when read as a whole, differentiates between licensed facilities, where traditional casino activities are permitted, and nonprimary locations, where only pari-mutuel horse race betting and sports wagering are allowed.

For these reasons, the Board did not err in sustaining Applicant's appeal and determining that L&I erred by withdrawing and replacing the Notice of Referral, which requires an application to the Board for a special exception, with a Notice of Refusal, which requires a variance from the Zoning Code.

## B. Special Exception Requirements

The Zoning Code empowers the Board to grant special exceptions in Philadelphia. *See* Zoning Code § 14-103(4)(a)(.2). As this Court has explained,

13

[g]enerally speaking, a special exception is not an exception to a zoning ordinance, but rather a use which is expressly permitted, absent a showing of a detrimental effect on the community. The important characteristic of a special exception is that it is a conditionally permitted use, legislatively allowed if the standards are met.

*Siya Real Est. LLC v. Allentown City Zoning Hearing Bd.*, 210 A.3d 1152, 1157 (Pa. Cmwlth. 2019) (internal citations, brackets, and quotation marks omitted). An applicant for a special exception in Philadelphia bears the initial burden of putting forth evidence

> that the grant of a special exception will not cause the following specific detrimental impacts to the neighborhood beyond that which normally might be expected from the proposed use:
>
> (.a) Congestion in the public streets or transportation systems;
>
> (.b) Overcrowding the land;
>
> (.c) Impairing an adequate supply of light and air to adjacent property;
>
> (.d) Burdening water, sewer, school, park, or other public facilities;
>
> (.e) Impairing or permanently injuring the use of adjacent conforming properties;
>
> (.f) Endangering the public health or safety by fire or other means; or
>
> (.g) Inconsistency with the Comprehensive Plan of the City.

Zoning Code § 14-303(7)(e)(.2).

Once an applicant has met this initial burden, any objectors to a proposed special exception use then have "the duty of presenting objective evidence, and the burden of proof, that the proposed use is substantially likely to cause a detrimental impact on the health, safety, and welfare of the neighborhood exceeding that which normally might be expected from the proposed use." Zoning Code § 14-303(7)(e)(.3). "The objectors also may present evidence, and have the burden of proof, that the proposed use fails to conform with the purpose, spirit, and intent of this Zoning Code." *Id.* Objectors must prove "to a high degree of probability" that the impact from the proposed use will substantially affect the community health, safety, and welfare to a greater extent than would be expected normally from that type of use. *Tower Access Grp., LLC v. S. Union Twp. Zoning Hearing Bd.*, 192 A.3d 291, 300 (Pa. Cmwlth. 2018) (quoting *Blancett-Maddock v. City of Pittsburgh Zoning Bd. of Adjustment*, 6 A.3d 595, 600 (Pa. Cmwlth. 2010)). Further, "an objector cannot meet his burden with speculation." *Tower Access*, 192 A.3d at 300.

Regarding special exception determinations, the Zoning Code requires that the "Board shall, in writing, set forth each required finding for each special exception that is granted, set forth each finding that is not satisfied for each special exception that is denied, and to the extent that a specific finding is not relevant to the decision, shall so state." Zoning Code § 14-303(7)(e).

To meet its initial burden, Applicant called multiple witnesses to testify before the Board. First, Chickie's and Pete's President and Chief Executive Officer, Peter Ciarrocchi (Ciarrocchi), testified. *See* N.T. 12/1/2020 at 27-42; N.T. 5/25/2021 at 38-40; *see also* July 2021 Board Decision at 2-3, Findings of Fact (F.F.) Nos. 13-16 & 100. Ciarrocchi testified that Chickie's and Pete's is a restaurant and

sports bar located at the New Location since 2003. *See* N.T. 12/1/2020 at 28; *see also* July 2021 Board Decision at 2, F.F. No. 14. Ciarrocchi explained his intent to put a high-end boutique sportsbook into a 2,600-square-foot portion of Chickie's and Pete's to provide his customers with an additional amenity to the existing sports bar atmosphere. *See* N.T. 12/1/2020 at 28; *see also* July 2021 Board Decision at 3, F.F. No. 15. Ciarrocchi explained that the introduction of the sportsbook will reduce the New Location's seating capacity. *See* N.T. 12/1/2020 at 36. Ciarrocchi also explained that he is part of the neighborhood and that, if he thought the proposed relocation of Applicant's sportsbook operation to the New Location would have any adverse impact on the neighborhood, he would not do it. *See* N.T. 12/1/2020 at 28 & 37-38. Ciarrocchi further testified that there will be no slot machines or table games at the New Location, only the sportsbook operation. *See* N.T. 12/1/2020 at 39; *see also* July 2021 Board Decision at 3, F.F. No. 16. The sportsbook will not have a separate entrance and will not be open any time other than when Chickie's and Pete's is open. *See* N.T. 12/1/2020 at 40-41.

Ronald Davis (Davis), the Director of Diversity and Community Development for Parx Casino,[13] also testified before the Board on Applicant's behalf. *See* N.T. 12/1/2020 at 42-48; *see also* July 2021 Board Decision at 3, F.F. No. 18. Davis elaborated on a wide range of community outreach programs in which Applicant participates and testified that the relocation of the sportsbook to the New Location would be a great opportunity for the community, in that Applicant would be able to expand its outreach programs. *See* N.T. 12/1/2020 at 43-47; *see also* July 2021 Board Decision at 3, F.F. No. 18. Davis further testified that there would

---

[13] Applicant is the operator of Parx Race and Sportsbook and a subsidiary of parent company Parx Casino. *See* July 2021 Board Decision at 1, F.F. No. 1.

16

"definitely" be no harm to public health or neighboring properties from the proposed relocation of Applicant's sportsbook to the New Location. *See* N.T. 12/1/2020 at 48; *see also* July 2021 Board Decision at 3, F.F. No. 18.

Matthew Cullen (Cullen), the Senior Vice President of Interactive Gaming and Sports Wagering for Parx Casino, also testified on behalf of Applicant. *See* N.T. 12/1/2020 at 49-58; N.T. 5/25/2021 at 14-37; *see also* July 2021 Board Decision at 3, F.F. Nos. 19-24 & 92-99. Cullen testified that the Current Location is too large a space to continue Applicant's sportsbook operation, and that relocation is necessary to preserve the business and its employees. *See* N.T. 12/1/2020 at 49-52; *see also* July 2021 Board Decision at 3, F.F. No. 19. Cullen testified that the New Location will be subject to oversight by multiple state agencies, including the Pennsylvania State Horse Racing Commission, the Pennsylvania Gaming Control Board, and the Pennsylvania Liquor Control Board. *See* N.T. 12/1/2020 at 52-53; *see also* July 2021 Board Decision at 3, F.F. No. 22. Additionally, Cullen explained that the New Location will not include slot machines or table games. *See* N.T. 12/1/2020 at 52-53; *see also* July 2021 Board Decision at 3, F.F. No. 21. Cullen further testified that the relocation of Applicant's sportsbook operation to the New Location would not harm the local community or neighborhood. *See* N.T. 12/1/2020 at 53 & 56; *see also* July 2021 Board Decision at 3, F.F. No. 23. He explained that the proposed relocation would not increase vehicular traffic in the area or overcrowd local parking lots. *See* N.T. 12/1/2020 at 54-55; *see also* July 2021 Board Decision at 3, F.F. No. 23. Cullen also testified that the relocation would preserve many jobs for the community. *See* N.T. 12/1/2020 at 55; *see also* July 2021 Board Decision at 3, F.F. No. 23. Cullen reiterated that the sportsbook operation would not be open beyond Chickie's and Pete's operating hours. *See* N.T. 12/1/2020 at 56.

17

Applicant also presented the testimony of Jeremy Drummond (Drummond), the principal architect working with Applicant on the relocation project. *See* N.T. 12/1/2020 at 59-71; *see also* July 2021 Board Decision at 3, F.F. Nos. 25-29. Drummond testified that the project is intended to downsize Applicant's sportsbook operation from the 36,000-square-foot space at the Current Location to a 2,600-square-foot area in the New Location. *See* N.T. 12/1/2020 at 60-61; *see also* July 2021 Board Decision at 3, F.F. No. 26. The entire space would be enclosed, and, for security purposes and to prevent entry by minors, there would be one entrance to the sportsbook, when complete. *See* N.T. 12/1/2020 at 62-64; *see also* July 2021 Board Decision at 3, F.F. No. 26. Drummond explained that the project would reduce the number of patrons within the New Location, and that no new parking would be required to accommodate the sportsbook operation at the New Location. *See* N.T. 12/1/2020 at 64-67; *see also* July 2021 Board Decision at 3, F.F. No. 27. Drummond testified that the approval of the Relocation Application would have no detrimental impacts on the surrounding community beyond that which might normally be expected from the proposed use. *See* N.T. 12/1/2020 at 67 & 69; *see also* July 2021 Board Decision at 3, F.F. No. 29. Drummond explained that the proposed relocation to the New Location would not cause traffic congestion, overcrowd the land, or in any way increase burdens on water or sewer systems, local schools, parks, or other public facilities. *See* N.T. 12/1/2020 at 68; *see also* July 2021 Board Decision at 3, F.F. No. 29. Drummond further testified that the proposed relocation of Applicant's sportsbook operation to the New Location is consistent with Philadelphia's comprehensive plan. *See* N.T. 12/1/2020 at 68; *see also* July 2021 Board Decision at 3, F.F. No. 29.

Fred Harran (Harran), Director of Public Safety for the Bensalem Township Police Department, also testified on Applicant's behalf. *See* N.T. 3/9/2021 at 93-106; *see also* July 2021 Board Decision at 3, F.F. Nos. 68-72. Harran testified that community concerns about increased crime in relation to bringing the Parx Casino to Bensalem had been unfounded, and that crime actually decreased in Bensalem in the 15 years since the Parx Casino became fully functional. *See* N.T. 3/9/2021 at 95-98; *see also* July 2021 Board Decision at 8, F.F. Nos. 69-70. Based on this experience, Harran testified that he did not believe the relocation of Applicant's sportsbook from the Current Location to the New Location would lead to an increase in neighborhood crime. *See* N.T. 3/9/2021 at 98; *see also* July 2021 Board Decision at 8, F.F. No. 70. He further testified that he did not believe the relocation of Applicant's sportsbook operation from the Current Location to the New Location would have a detrimental impact on the health, safety, and welfare of the neighborhood as a whole. *See* N.T. 3/9/2021 at 99; *see also* July 2021 Board Decision at 8, F.F. No. 70. On cross-examination, Harran explained that he did not attribute the decrease in crime in Bensalem to the presence of the Parx Casino but noted instead that the community's feared increase in crime never developed. *See* N.T. 3/9/2021 at 99-100; *see also* July 2021 Board Decision at 8, F.F. Nos. 70-71.

Independent traffic engineer Debbie Ferraro (Ferraro) also testified for Applicant. *See* N.T. 3/9/2021 at 108-43; *see also* July 2021 Board Decision at 8-9, F.F. Nos. 74-80. Ferraro testified that she studied the possible traffic impact of the relocation of Applicant's sportsbook to the New Location and determined that an overall reduction in vehicle trips at the site would occur during peak hours, based on the reduced seating. *See* N.T. 3/9/2021 at 112-15; *see also* July 2021 Board Decision at 8, F.F. No. 74. She concluded that the site has adequate parking, in excess of

Zoning Code requirements, for both patrons and employees. *See* N.T. 3/9/2021 at 116-18, 137 & 142; *see also* July 2021 Board Decision at 8, F.F. Nos. 74-75. Ferraro also agreed that the relocation project would not cause unexpected congestion or traffic in the neighborhood's public streets or on the local transportation systems, and that the relocation project would not impose an unexpected burden on local parks, schools, or other public facilities. *See* N.T. 3/9/2021 at 116; *see also* July 2021 Board Decision at 8, F.F. No. 75. Ferraro ultimately concluded that the relocation project would not have a detrimental impact on the health, safety, and welfare of the neighborhood. *See* N.T. 3/9/2021 at 115; *see also* July 2021 Board Decision at 8, F.F. No. 75.

Jerry Fretz (Fretz), the Director of Security at Parx Casino,[14] also testified for Applicant. *See* N.T. 3/9/2021 at 143-64; N.T. 5/25/2021 at 7-14; *see also* July 2021 Board Decision at 9-10, F.F. Nos. 81-87 & 91. Fretz described the basic security precautions expected at the New Location and testified that the proposed relocation of the sportsbook to the New Location would have "no impact whatsoever" on security. *See* N.T. 3/9/2021 at 144-48; *see also* July 2021 Board Decision at 9, F.F. No. 81. He testified that the relocation of Applicant's sportsbook operation to the New Location would not result in increased criminal activity in the neighborhood. *See* N.T. 3/9/2021 at 149-50. Fretz also testified that the relocation of the sportsbook operation to the New Location would not cause impairment to the surrounding community or neighborhood beyond what would normally be expected of such a use and was not likely to cause an increased adverse impact on public

---

[14] Fretz joined the Parx Casino Team in August of 2008, shortly after having retired from 31 years on the Philadelphia Police Department. *See* N.T. 3/9/2021 at 144.

health or safety. *See* N.T. 3/9/2021 at 148-49; *see also* July 2021 Board Decision at 9, F.F. No. 84.

Additionally, Ian Hegarty of the Philadelphia City Planning Commission (Planning Commission) testified that the Planning Commission recommended granting Applicant's Special Exception Application. *See* N.T. 6/9/2021 at 2; *see also* July 2021 Board Decision at 15, F.F. No. 126.

To sustain its burden that the proposed use is substantially likely to cause a detrimental impact on the health, safety, and welfare of the neighborhood exceeding that which normally might be expected from the proposed use, the Association presented the testimony of three witnesses before the Board. *See* N.T. 5/25/2021 at 41-106; *see also* July 2021 Board Decision at 11-15, F.F. Nos. 101-24. First, the Association presented Les Bernal (Bernal), the national director of Stop Predatory Gambling, a national non-profit organization based in Washington, D.C.[15] *See* N.T. 5/25/2021 at 41-81; *see also* July 2021 Board Decision at 11-14, F.F. Nos. 101-20. Bernal's testimony concentrated on the link between sports gambling and gambling addiction, and the perceived threat and harm of moving the sportsbook operation to the New Location. *See* N.T. 5/25/2021 at 41-42 & 45; *see also* July 2021 Board Decision at 11, F.F. No. 101. Bernal testified generally and broadly about gambling, the gambling industry, and gambling addiction. *See* N.T. 5/25/2021 at 52-64; *see also* July 2021 Board Decision at 12-13, F.F. Nos. 109-14. Bernal testified that the dangers of gambling presented a problem in this matter by moving

---

[15] Bernal has a master's degree in public administration and has been the executive director of Stop Predatory Gambling since 2008. *See* N.T. 5/25/2021 at 42. He has testified before legislative bodies across the country, including state legislatures, city councils, and the United States Congress. *See id.* at 42-43. He has been quoted and cited over 600 times by newspapers and magazines and has appeared on multiple national television and radio programs. *See id.* at 43. He is not, however, a licensed addiction clinician. *See* N.T. 5/25/2021 at 77 & 79.

21

closer to a residential area and opined that it was "outrageous" to propose relocating the sportsbook operation to a restaurant in which children were present. *See* N.T. 5/25/2021 at 64-66 & 71-72; *see also* July 2021 Board Decision at 13, F.F. Nos. 114-16. Bernal testified that he has never been to the New Location and has not been even close to it recently. *See* N.T. 5/25/2021 at 48; *see also* July 2021 Board Decision at 11, F.F. No. 106.

Kristin Ricchiuti (Ricchiuti), Vice President of the Association, also testified before the Board. *See* N.T. 5/25/2021 at 82-85; *see also* July 2021 Board Decision at 14, F.F. No. 121. Ricchiuti lives in the neighborhood where the New Location is located. *See* N.T. 5/25/2021 at 83; *see also* July 2021 Board Decision at 14, F.F. No. 121. Ricchiuti expressed her concern that the proposed use at the New Location would normalize gambling behavior and thereby change the character of the shopping center where Chickie's and Pete's is located and, thus, the character of the neighborhood, by creating a "sordid atmosphere where [] childhoods advance far too quickly." N.T. 5/25/2021 at 84; *see also* July 2021 Board Decision at 14, F.F. No. 121.

Next, the Association presented the testimony of its President Barbara Capozzi (Capozzi). *See* N.T. 5/25/2021 at 85-106; *see also* July 2021 Board Decision at 14-15, F.F. Nos. 122-24. Capozzi described the shopping center in which the New Location is located as well as purported neighborhood opposition to the proposed relocation of Applicant's sportsbook operation to the New Location through a petition, Association meetings, and a rally. Capozzi described the shopping center in general, and Chickie's and Pete's in particular, as a family-friendly place where people bring their children for all kinds of occasions. *See* N.T. 5/25/2021 at 91-98; *see also* July 2021 Board Decision at 14-15, F.F. No. 123. Her

objection to the proposed sportsbook relocation to the New Location was that "[g]ambling hurts people. It destroys families. It depletes savings." N.T. 5/25/2021 at 98; *see also* July 2021 Board Decision at 14, F.F. No. 122.

Based on this evidence, the Board voted four to one to deny the Special Exception Application. *See* N.T. 6/9/2021 at 2-3; *see also* July 2021 Board Decision at 15, F.F. No. 127. The Board explained the denial by concluding:

> 13. In this case, [] Applicant did not produce sufficient credible evidence to meet the [Zoning] Code's requirements or to persuade the Board to credit the evidence which was produced.
>
> 14. [] Applicant's witnesses employed by [] Applicant – [] Davis, [] Cullen, [and] Fretz – offered their opinions that granting the special exception would not result in disqualifying adverse impacts, but they did not provide any basis for those opinions.
>
> 15. Similarly, the project's architect gave his unsupported opinion that the special exception would not result in disqualifying adverse impacts.
>
> 16. [] Ferraro, a traffic engineer, offered her opinion that granting the special exception would not affect the neighborhood's overall traffic operation but also offered her unsubstantiated opinion that granting the special exception would not have a detrimental impact on the neighborhood's health, safety or welfare.
>
> 17. [] [A]pplicant did not meet its burdens[.]

July 2021 Board Decision at 18-19, Conclusions of Law (C.L.) 13-17.

On review, the Trial Court granted Applicant's appeal, concluding that the Board "abused its discretion and committed fundamental errors of law in its

consideration of the testimony and application of the special exception burden shifting." Trial Court Opinion at 8. The Trial Court explained that

> the [Board] arbitrarily and capriciously disregarded all of [Applicant's] unrebutted argument and testimony without any reasonable explanation. In the face of no contradictory testimony, the [Board] concluded that [Applicant] did not meet the criteria for a special exception. The [Board] abuses its discretion when it capriciously disregards material, competent evidence.

Trial Court Opinion at 8. With regard to Applicant's initial burden, the Trial Court stated that

> the [Board] had an obligation to set forth the reason that each (or all) of the criteria for a special exception [were] not met, or why a criteri[on] was not relevant to the decision. The [Board] completely abdicated this role by offering no specific explanations whatsoever.

Trial Court Opinion at 8-9. The Trial Court continued:

> With broad general strokes, the [Board] discounted all of [Applicant's] arguments and testimony. The [Board] did not make any specific credibility determinations. It simply cast aside all of [Applicant's] testimony. Based on the [Board's] woefully inadequate reasoning and scant explanations, the decision appears more result oriented, rather than fact driven; no amount of testimony, or no set of facts, would have met the impossible standard apparently set by the [Board]. Stated another way, the [Board's] conclusions have little to no support, let alone the substantial evidence required to support its conclusion on this issue.

24

Trial Court Opinion at 9 (citation omitted). Ultimately, the Trial Court found that the Board "abused its discretion and committed an error of law in finding that [Applicant] did not meet its initial burden." *Id.*

Continuing its analysis, the Trial Court determined that the record contained insufficient evidence to conclude that the Association had met its burden of showing that the proposed relocation of Applicant's sportsbook operation to the New Location is likely to cause a detrimental impact on the neighborhood's health, safety, and welfare beyond that which might be normally expected from the proposed use. *See* Trial Court Opinion at 9-11. The Trial Court found that

> the [Board's] conclusions of law completely ignore the [Association's] burden, and do not address it at all. The [Board] found facts, however, related to the [Association's] arguments. In all, the [Association] merely speculate[s] and pose[s] general concerns regarding the relocation. The thrust of the [Association's] argument is that moving the gambling facility a few blocks away or slightly closer to a residential neighborhood would cause the requisite detrimental impact on the health and safety of the community. The problem with this argument is that gambling is already pervasive in the neighborhood, and generally in society.
>
> [Applicant] is only seeking to move the gambling facility a total of [eight] blocks. The [N]ew [ L]ocation, as acknowledged by the [Board], is slightly closer to residential houses than the [Current L]ocation. The [Association] repeatedly offered general testimony regarding the negative impacts of gambling on society, but this is not the standard. The [Philadelphia] City Council, through previously allowing gambling at the [Current L]ocation, and allowing the special exception analysis in the CA-1 zoned district where the [New Location] is located, has implicitly already considered that such a use

25

satisfies local concerns for the general health, safety, and welfare.

Moreover, the [Association's] repeated assertions that relocating the gambling facility [eight] blocks could corrupt children is pure speculation. It is unnecessary to look only to the factual record on this point. Common sense and general observation confirms that gambling is pervasive in modern society. There are ads on public transit, billboards on the highway, commercials on television and the internet, and numerous sports teams are sponsored by and/or collaborate with gambling companies. The notion that moving a gambling facility [eight] blocks, placing it slightly closer to residences, would increase gambling exposure to children is unsupported conjecture.

The [Association] had to show, with a high degree of probability, that [Applicant's] proposal would pose a substantial threat to the health and safety of the community. The [Association], even fully crediting the findings of the [Board], fall[s] short of meeting that burden.

Trial Court Opinion at 10-11 (internal citations omitted).

On review, we observe that Applicant put forth evidence that, on its face, satisfied the burden set forth in Zoning Code Section 14-303(7)(e)(.2) that Applicant must demonstrate no detrimental impact to the community beyond that which normally might be expected from the proposed use. Applicant's traffic engineer Ferraro testified that the proposed relocation would not create additional traffic congestion in the public streets and that, in fact, the proposed project would result in decreased traffic congestion. Ciarrocchi, Drummond, and Cullen all testified that the project would not result in overcrowding, as the patron capacity of the New Location would be lowered from current numbers by the introduction of

26

the sportsbook at the New Location. Applicant's witnesses further explained that this reduction in patron capacity would lessen the stresses on water, sewer, and other public facilities.[16] Multiple Applicant witnesses, including Applicant's Director of Security and the Director of Public Safety for the Bensalem Township Police Department, testified that the relocation of Applicant's sportsbook operation would not endanger the public health, safety, or welfare of the community by increasing incidents of crime or fire. Additionally, in recommending approval of the proposed relocation, Ian Hagerty of the Planning Commission testified that the proposed relocation was consistent with the City's comprehensive plan. On its face, this evidence[17] satisfies the requirements of Zoning Code Section 14-303(7)(e)(.2) to demonstrate no detrimental impact to the community beyond that which normally might be expected from the proposed use.

We observe that "[r]eview for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court." *Ziegler v. City of Reading*, 216 A.3d 1192, 1203 (Pa. Cmwlth. 2019) (quoting *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002)). As this Court has observed, "[c]apricious disregard occurs only when the fact-finder deliberately ignores relevant, competent evidence." *Ziegler*, 216 A.3d at 1203.

---

[16] We acknowledge that the sportsbook operation would have no bearing on loads placed on local parks or schools, regardless of where it is located.

[17] We observe that the relocation involves no proposed exterior expansion of the New Location to accommodate the sportsbook operation. Therefore, the Section 14-303(7)(e)(.2) factors of "impairing an adequate supply of light and air to adjacent property" and "impairing or permanently injuring the use of adjacent conforming properties" are not applicable to the instant matter.

27

Here, without making express credibility determinations as to the witnesses, the Board disregarded Applicant's material, competent evidence regarding the Section 14-303(7)(e)(.2) factors, instead simply characterizing Applicant's witnesses' testimony as "unsupported opinions." This blanket characterization leaves a reviewing court to surmise what parts of the witnesses' testimony the Board regarded as unsupported opinion and further, considering the witnesses each testified as to their occupation and experience, what additional support is required to validate their opinions. As the Trial Court noted, the Board had an obligation to set forth with specificity how Applicant failed to meet each criterion (or all criteria) for a special exception and/or why a particular criterion was not relevant to the decision. *See* Zoning Code § 14-303(7)(e). By offering, without specific explanations, a blanket finding that the testimony of the witnesses was unsupported, the Board failed to meet its obligation to explain the failure to grant the requested special exception, and the Trial Court correctly concluded as much. *See* Trial Court Opinion at 8-9; *see also* Zoning Code § 14-303(7)(e).

Further, we agree with the Trial Court that the Association failed to meet its burden of demonstrating that the proposed relocation of the sportsbook to the New Location would detrimentally affect the health, safety, and welfare of the neighborhood to a greater extent than would normally be expected from the proposed use. *See* Trial Court Opinion at 9-11. The Association's evidence amounted to generalized testimony about the possible pitfalls of legal gambling and testimony from local residents that they oppose the relocation because they feel the character of the neighborhood may be affected. The Association's evidence did not objectively illustrate to a high degree of probability a substantial likelihood that the proposed relocation of Applicant's sportsbook operation from the Current Location

28

to the New Location would cause a detrimental impact on the health, safety, and welfare of the neighborhood exceeding that which normally might be expected from the proposed use. In essence, the theoretical visitation of the possible pitfalls of gambling on the neighborhood's occupants and the detrimental effects on children as described and imagined by the Association's witnesses amount to speculation, which is insufficient to meet the Association's burden. Accordingly, the Trial Court correctly determined that the record lacks substantial evidence to support the Board's conclusion that the proposed relocation of the sportsbook operation to the New Location will cause a detrimental impact on the neighborhood's health, safety, and welfare beyond what would normally be expected from such a use.

## IV. Conclusion

For these reasons, we affirm the Trial Court's orders.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Appeal of City Turf Club Op Co. | : | **CONSOLIDATED CASES** |
| | : | |
| From a Decision of: Zoning Board of Adjustment | : | |
| | : | |
| Appeal of: Packer Park Civic Association | : | No. 731 C.D. 2022 |
| | : | |
| In re: Appeal of Packer Park Civic Association | : | |
| | : | |
| From a Decision of: Zoning Board of Adjustment | : | |
| | : | |
| Appeal of: Packer Park Civic Association | : | No. 733 C.D. 2022 |

## O R D E R

AND NOW, this 8th day of January, 2024, the July 1, 2022, orders of the Philadelphia County Court of Common Pleas are AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge